**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **LEXINGTON LUMINANCE LLC** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **No.  1:12-cv-11554-WGY** |
| | § | |
| **FEIT ELECTRIC COMPANY, INC.** | § | **JURY DEMANDED** |
| | § | |
| *Defendant*. | § | |
| | § | |

### LEXINGTON LUMINANCE LLC'S OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARDS .........................................................................................1

III.   BACKGROUND ...................................................................................................1

IV.    AGREED CLAIM CONSTRUCTIONS ...............................................................3

V.     DISPUTED CLAIM CONSTRUCTIONS ............................................................3

VI.    ARGUMENTS AND AUTHORITIES REGARDING DISPUTED CLAIM TERMS .........4

     1.   Etched Trenches.................................................................................... 4

     2.   Prescribed ............................................................................................ 7

     3.   Layer .................................................................................................... 9

     4.   Microfacets ........................................................................................ 11

     5.   Sloped etching profile with a smooth rotation of microfacets............................ 12

     6.   Having................................................................................................. 16

     7.   Profile… without a prescribed angle of inclination............................................ 17

     8.   First layer… comprising a plurality of inclined lower portions ......................... 19

VII.   CONCLUSION....................................................................................................22

## I.      INTRODUCTION

Plaintiff Lexington Luminance LLC ("Lexington" or "Plaintiff") submits this Opening

Claim Construction Brief wherein it offers its proposed constructions, which are consistent with

the intrinsic and extrinsic record, and disputes those  constructions proposed by Defendant Feit

Electric Company, Inc. ("Feit").

## II.     LEGAL STANDARDS

This Court is familiar with the pertinent claim construction principles.  For convenience,

Lexington cites to relevant authority in the body of its brief.

## III.    BACKGROUND

U.S. Patent No. 6,936,851 (the "'851 Patent"), entitled "Semiconductor Light-Emitting

Device and Method For Manufacturing The Same," is directed to a novel use of etched patterns

on the substrate to improve the operation of certain semiconductor devices.  *See* Ex. 1.  The '851

Patent relates to light-emitting diodes, or "LEDs" which are devices that convert electricity into

light and are increasing used for lighting applications.  An LED generally consists of layers of

different semiconductor material that are grown on a base material known as a "substrate."

LEDs commonly use an active layer of semiconductor material formed between two oppositely

doped layers, one being "p-type" and the other being "n-type."  The "p-type" layer has positive

charge carriers, called holes, and the "n-type" layer has negative charge carriers, called electrons.

During operation, a current is applied across electrical contacts to the doped layers, which causes

negatively charged electrons and positively charged holes to move from the doped layers into the

active layer. The electrons and holes meet (or "recombine") and generate light.

Much recent LED fabrication has used a crystalline layer, e.g., gallium nitride (GaN), on

top of a crystalline substrate, e.g., sapphire ($Al_2O_3$).  However, the combination of these

materials has led to a lattice mismatch problem between the layers.  A lattice mismatch between layers exists when two materials exhibit different lattice constants, that is, an unequal distance between the unit cells that comprise a crystal lattice.  This mismatch leads to dislocations in the material system in which the atoms in the grown crystalline semiconductor layers do not exactly line up with those in the substrate, causing cracks or dislocations to form in the layers.  In semiconductor fabrication, the epitaxial process applies a crystalline overlayer, also known as an epitaxial layer, on top of a crystalline substrate.  The lattice constant indicates the degree of structural compatibility between different materials.  A difference in the lattice constant of the materials leads to lattice mismatch, which leads to strain where the materials meet.  This strain prevents the growth of thicker layers without the introduction of defects.  The introduction of increased defects limits the size of the wafers that may be reliably produced.

The inventor of the '851 Patent, Dr. Tien Wang[1], recognized that the direction of such defect propagation is generally perpendicular to the plane where the two materials meet.  He determined that if the surface of the substrate were etched to form certain types of trenches, the defect propagation could be confined to a particular location.  By restricting where the defects could propagate, the number of defects that could propagate into the active layer and affect the operation of the LED was substantially reduced.  Dr. Wang made use of an etching of the substrate surface that resulted in a textured district made up of smooth trenches.  Because the trenches are smooth, the angle of orientation of the surface of the trench varies over the width of the trench so that there is no predetermined angle of orientation as there might be if the trenches followed a sharp saw-tooth pattern.  Put another way, if one assumes that the surface of the trench was modeled by many very tiny facets, the angle of orientation of these microfacets would

---

[1] Dr. Tien Y. Wang obtained his PhD. In Material Science and Engineering from the University of Utah in 1990 and since that time has worked in many capacities related to the design and development of LED technology.

approximate a smooth surface.  Dr. Wang found that by using the smooth trenches, the defect

propagation from one side of the trench would counter the defect propagation from the other side

of the trench, and the defect propagation from the two sides would combine in the trench region,

thus minimizing the propagation of defects into the active layer.

Some of the disputed claim terms appear within other claim terms.  The disputed claim

terms are located in claim 1 in the following locations:

1. A semiconductor light-emitting device comprising:

a substrate;

a textured district defined on the surface of said substrate comprising a plurality
of **etched trenches having** a **sloped etching profile with a smooth rotation of
microfacets without a prescribed angle of inclination**;

a **first layer** disposed on said textured district; **comprising a plurality of inclined lower
portions** so as to guide the extended lattice defects away from propagating into
the active layer, said first **layer** and said substrate form a lattice-mismatched
misfit system, said substrate is selected from the group comprising group III-V,
group IV, group II-VI elements and alloys, ZnO, spinel and sapphire; and

a light-emitting structure containing an active **layer** disposed on said first **layer**.

## IV.    AGREED CLAIM CONSTRUCTIONS

| Term | Agreed Construction |
|------|---------------------|
| substrate | the supporting material upon which the other layers of an light-emitting device are grown |
| active layer | the layer in the light-emitting device that emits the light |
| disposed on | applied directly or indirectly above |
| so as to guide the extended lattice defects away from propagating into the active layer | such that free propagation of extended lattice defects into the active layer is significantly reduced relative to a device made by the same process without the textured districts |

## V.    DISPUTED CLAIM CONSTRUCTIONS

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|------|-----------------------------------|------------------------------|

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| etched trenches | an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate | etched elongated stripes |
| prescribed | predetermined | constant |
| layer | a thickness of material, which may be made up of sub-layers, but does not refer to a substrate | defined thickness of material |
| microfacets | very small planes that make up a surface contour | planar surfaces on the order of microns in size |
| sloped etching profile with a smooth rotation of microfacets | sloped surface contour without sharp corners above the substrate base | etched cross-section without sharp corners and with a gradual, incremental rotation in slope from microfacet to microfacet |
| having | comprising | consisting of |
| profile… without a prescribed angle of inclination | [No construction necessary], otherwise: surface contour... without a predetermined angle of inclination above the substrate base | cross-section . . . without a constant angle of inclination such that there are no linear portions |
| first layer… comprising a plurality of inclined lower portions | [No construction necessary], otherwise: first layer having lower portions that contain inclines | first layer . . . comprising two or more portions that grow from adjacent slopes of the trench so as to meet and combine in the trench region |

## VI.   ARGUMENTS AND AUTHORITIES REGARDING DISPUTED CLAIM TERMS

### 1.   Etched Trenches

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| etched trenches | an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate | etched elongated stripes |

**An "etched trench" is the three-dimensional area that is removed from the surface of the substrate.**

The specification teaches that an etched trench is formed by removing material from the

substrate.  Col. 2:27-34; 3:47-4:36.  Extrinsic sources also show that a trench is an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate.  *See, e.g.*, *UniRAM Technology, Inc. v. Monolithic System Technology, Inc.*, 2006 U.S. Dist. LEXIS 21661 (N.D. Cal., March 30, 2006) (construing a trench as "a recess in the surface of the substrate");  *see also Motorola, Inc. v. Analog Devices, Inc.*, No. 1:03-CV-131 (E.D. Tex., March 23, 2004) ("[b]oth parties agree that 'trench' is defined in the Sematech Dictionary as 'a deeply etched area used to isolate one area from another or to form a storage capacitor on a silicon wafer.'").

It is also instructive to review relevant publications in the field.  For example, the Kang article describes Gallium Nitride grown on patterned sapphire substrates, the same art at issue here.  *See* Ex. A.  As shown below, Kang uses a two-dimensional schematic diagram to illustrate the location of the trench area vis-à-vis the substrate feature, while the same figure also reveals an image of the resulting three-dimensional pattern around the trenched area.  *Id.* at 1896.



Fig. 1.  Schematic diagram of GaN on PSS. The SEM micrograph shows the patterned sapphire substrate after dry etching.

The intrinsic and extrinsic evidence reveal that the trenches need not have dimensional restrictions.  The law is clear that Courts must take "extreme care" when ascertaining the proper scope of the claims not to "simultaneously import into the claims limitations that were unintended by the patentee."  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003).  This is true even when the preferred embodiments reflect this feature.  *Id*. at 1328.

**Any reference to a "stripe" in the specification only applies to an embodiment of the invention and no limitation should be imported into the claims.**

Feit attempts to incorporate limitations of an embodiment into the claims.  The specification states that "[i]n accordance with an **illustrative embodiment** of the present invention mesa or <u>stripe</u> features are first defined… ."  Col 3:47-48 (emphasis added).  The specification continues "[**f]or example**, <u>stripes</u> along the [011] or the [01<u>1</u>] direction are… ." Col. 3:54-55 (emphasis added).  The specification notes that the use of stripes is one *option* for accomplishing the etching process.  The specification further states that "[i]n the present invention, the substrate is patterned using **conventional lithographic methods**… ."  Col. 2:27-28 (emphasis added).  Conventional lithographic methods in common use at the time of the invention performed etching using a *variety* of patterns.  Thus, importing the stripe limitations into the claims is inappropriate.

The lower portion of the layer deposition takes place in the area of the trench and forms a contour on the textured district of the substrate.  That the patent drawings depict two-dimensional cross-sectional views does not imply that the claims refer to trenches that only contain a specific cross-section or trenches that only exist in a particular configuration.  *See Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does

not operate to limit the claims to that specific configuration".)

If any dimension is to be attributed to a "trench" it would be its depth relative to the surface. *See* Sematech Dictionary http://www.sematech.org/publications/dictionary/ti_to_tz.htm (last visited March 25, 2013) (defining "trench" as "a deeply etched area used to isolate one area from another or to form a storage capacitor on a silicon wafer").  However, there exists no intrinsic support for any dimensional constraint.  The patent specification does not support Feit's suggestion that the trenches must be construed as "elongated".

In summary, while the patent may disclose one or more preferred embodiments or one or more preferred modes of carrying out the invention, the claim cannot be construed to be limiting.  Accordingly, the Court should reject Feit's attempt to incorporate limitations of disclosed embodiments into the claims.

### 2.      Prescribed

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| prescribed | predetermined | constant |

The term "prescribed" is used in claim 1 in the following context:

> a textured district defined on the surface, of said substrate comprising a plurality of etched trenches having a sloped etching profile with a smooth rotation of microfacets without a **prescribed** angle of inclination;

**Adoption of Feit's construction would make a claim limitation superfluous.**

The parties generally agree that microfacets are small planar surfaces.[2]  For a smooth surface, the angle of the microfacet equals the angle of the curve on which the microfacet resides at any given point.  *See, e.g.*, Wikipedia http://en.wikipedia.org/wiki/Microfacet#Microfacets

---

[2] Lexington proposes the construction "very small planes that make up a surface contour" for microfacet while Feit proposes "planar surfaces on the order of microns in size".

(last visited March 25, 2013) ("The degree to which microfacet normals differ from the smooth surface normal is determined by the roughness of the surface.")  Therefore, *a rotation of microfacets* along a smooth surface would require that the surface be curved instead of flat.

Feit's proposed construction must be rejected because: (1) by definition, a sloped etching profile without a ***constant*** angle of inclination would require a curved surface; and (2) as explained above, a sloped etching profile with a smooth rotation of microfacets would require a curved surface.  Using Feit's proposed construction, both limitations would require a curved surface.  Therefore, there would be no need for one of the limitations.  Accordingly, Feit's proposed construction must be rejected.  *See Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (construing claims to avoid rendering other claim terms superfluous).

**The specification's use of "prescribed" comports with Lexington's construction.**

The use of "prescribed" in the patent has been used in a way consistent with Lexington's proposed construction, i.e., "predetermined", or in some cases "determined" or "defined".  *See, e.g.*, cols. 1:67 ("the layer disposition over ***prescribed*** surface feature"); 3:37-39 ("the direction of inclined layer growth is not uniquely ***prescribed*** by mesa etching"); 4:62-63 ("there is no ***prescribed*** plane for the layer to grow"); and 7:57-58 ("across the local gettering centers ***prescribed*** inside the window").

**The extrinsic evidence supports Lexington's construction.**

The dictionary definition of "prescribed" is "to set down as a rule or direction; order; ordain; direct".  *See* Ex. B.  Thus, the plain meaning of "prescribed" requires a predetermination. The term "prescribed" has also previously been construed as "predetermined".  *See Catalina Marketing International, Inc. v. Coolsavings.com, Inc., et al.*, 115 Fed. Appx. 84 (Fed. Cir., Nov. 19, 2004) (unpublished) (construing "<u>prescribed</u> coupon limits" as "<u>predetermined</u> limits on the

number of coupons collectively and per store.") (emphasis added); *Instance v. On Serts Systems, Inc., et al.*, 1997 U.S. App. LEXIS 3080 (Fed. Cir., Feb., 21, 1997) (unpublished) (reasoning that a <u>prescribed</u> distance is a <u>predetermined</u> distance) (emphasis added); *TruePosition, Inc. v. Andrew Corp.*, 2007 U.S. Dist. LEXIS 62702 (D. Del., Aug. 23, 2007) (construing "<u>prescribed</u> set of reverse control channels" to mean "a <u>predetermined</u> range of frequencies that transmit control information in only one direction, from a cellular telephone to a cell site.") (emphasis added).

In summary, Lexington's proposed construction of "prescribed" as "predetermined" has both intrinsic and extrinsic support and should be adopted.  Feit's proposed construction has neither intrinsic nor extrinsic support, and would make a claim limitation superfluous.  Accordingly, the Court should adopt Lexington's construction.

### 3.    Layer

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|------|-----------------------------------|------------------------------|
| layer | a thickness of material, which may be made up of sub-layers, but does not refer to a substrate | defined thickness of material |

**Under the terms of the claim language, the substrate cannot be a "layer".**

Feit's proposed construction implies that a layer could also include a substrate.  However, that construction does not make sense in light of claim 1 of the patent.  Specifically, claim 1 includes a limitation requiring that a textured district exist on the surface of the substrate, and also that a first layer be disposed on the textured district.  Therefore, to construe a layer as including a substrate would mean that claim 1 could be read to include a substrate on a substrate.  Since this interpretation would not make sense, the term "layer" should be construed to exclude the substrate.

In addition, the specification discusses growing layers on a substrate.  *See, e.g.*, col. 4:47-49.  Therefore, it makes no sense to call the "substrate" a "layer."  *Accord Seoul Semiconductor Co. Ltd. v. Nichia Corp., et al.*, 596 F. Supp. 2d 1005 (E.D. Tex. 2009) (construing "layer" as "a thickness of material, which may be made up of sub-layers, but does not refer to a substrate in a device unless the substrate is an electronically active portion of the device.")

**Feit's proposal to include the word "defined" would lead to confusion and ambiguity.**

Moreover, Feit's inclusion of the word "defined" in its proposed construction does nothing to help a jury understand the term.  Feit's proposal invites speculation as to the meaning of the word "defined" and Feit does not suggest how the "thickness of material" is to be defined.  While it could be defined by chemical composition or material properties, it could also be defined by its proximity in relation to other layers.  In the case where Feit contends that "defined" should refer to the material used for a layer, there exists no support in the specification for the proposition that a particular material should be used for a layer, and indeed, there is no requirement that only one material must constitute a layer.  To the extent that materials are identified for particular layers in the specification, any such limitation of an embodiment cited in the specification should not be imported into the claims.

Further, Feit's proposal invites the possibility of transmuting one layer into two layers or transmuting two layers into one by arbitrarily "defining" the properties that purport to comprise a layer.  In addition, the plain dictionary meaning of "layer" is "a thickness of matter, esp. one of several, covering a surface."  *See* Ex. C.

There is no need to further confuse the issues, and ultimately the jury, by arbitrarily adding the word "defined".  Therefore, Feit's proposed inclusion of the word "defined" should be rejected.  *See WIMCO, LLC v. Lange Indus., Inc.*, No. 06-CV-3565, 2007 WL 4461629, at *4

(D. Minn. 2007) (providing no claim construction for a term where "any further definition or paraphrasing would serve no useful purpose").

### 4.      Microfacets

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|------|-----------------------------------|------------------------------|
| microfacets | very small planes that make up a surface contour | planar surfaces on the order of microns in size |

**No quantitative size restrictions should be placed on "microfacets".**

Feit's proposed construction attempts to place a quantitative restriction on the size of microfacets where no such size limitation should exist.  Lexington is unaware of any evidence in the intrinsic record that relates to sizes of microfacets.  "Micro" is simply a prefix meaning small.  *See* Ex. D at D6.  "Facet" is "the plane surface of a crystal".  *See* Ex. D at D5.  The term "microfacet" is used in the fields of semiconductors and computer engineering and its definition includes the assumption that "a surface is composed of a set of tiny planar patches".  *See* Ex. D at D10.  A "smooth rotation of microfacets" is indicative of a relatively smooth surface.  *See, e.g.*, Wikipedia http://en.wikipedia.org/wiki/Microfacet#Microfacets (last visited March 25, 2013) ("We assume that surfaces that are not perfectly smooth are composed of many very tiny facets, each of which is a perfect specular reflector. These microfacets have normals that are distributed about the normal of the approximating smooth surface. The degree to which microfacet normals differ from the smooth surface normal is determined by the roughness of the surface.")

Turning to semiconductor fabrication publications, the term "microfacets" is not limited to "on the order of microns in size".  For example, Johansson discusses "microfaceting of the nanowires".  *See* Ex. D at D11, Abstract.  Of course, it would be a physical impossibility for microfacets, if construed as "on the order of microns in size", to appear on the surface of a

*nano*wire which, applying the same logic, would be on the order of nanometers in size.[3]  Indeed, the term "microfacet" has frequently referred to surfaces that are less than 10 nanometers in size. *See, e.g.*, Ex. D at D12 (depicting in a semiconductor fabrication article, transmission electron microscopy images of nanowires containing microfacets in Figures 1a and 1b where the microfacets appear to be less than 10 nanometers in length); s*ee also* Ex. D at D21 (where the description refers to Figure 4 and to nanowires having a median diameter of 90 nanometers and containing multiple microfacets "too small to be identified"); *see also* Ex. D at D25 (identifying a surface roughness on a patterned sapphire substrate averaging 5 nanometers).

In summary, there is no basis in the intrinsic or extrinsic record to limit "microfacets" to "on the order of microns in size".  Instead, the evidence reveals that the term "microfacets" as it pertains to the field of semiconductors ***always*** involves very small planes that are ***much*** smaller than microns in size.  Accordingly, the Court should reject Feit's attempt to add strict dimensional limitations to the claim term.

## 5.   Sloped etching profile with a smooth rotation of microfacets

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| sloped etching profile with a smooth rotation of microfacets | sloped surface contour without sharp corners above the substrate base | etched cross-section without sharp corners and with a gradual, incremental rotation in slope from microfacet to microfacet |

The parties generally agree that a smooth rotation of microfacets is indicative of the absence of sharp corners.  However, the parties' proposed constructions differ in two aspects: whether the etching profile should be considered from a two-dimensional or a three-dimensional perspective; and whether the absence of sharp corners (or the smooth rotation of microfacets)

---

[3] One micron is equal to 1000 nanometers.

applies at the point of intersection where the base substrate and the feature atop the base substrate meet.

**"Sloped etching profile" means three-dimensional surface contour – <u>not</u> two-dimensional cross-section**

Feit's proposed use of "cross section" is at odds with the very essence of the invention. The invention describes the use of a textured district without sharp corner and that is naturally rounded and free of surface irregularities.  Col. 2:30-32.  "The textured surface district thus obtained is essential for the growth of smooth layers without the occurrence of chaotic micro-faceting."  Col. 2:32-34.  In short, the patent makes clear that optimally, ***all*** sharp edges in the textured district must be eliminated.  A skilled artisan would recognize that the "essential" smoothness and absence of "sharp corner[s]" is required of the entire surface contour of the substrate and is not limited to a particular (or arbitrary) cross-section of the textured district. Similarly, the patent does ***not*** teach, and the skilled artisan would ***not*** come to the conclusion that the patent was claiming (in relevant part) a textured district in which the trenches had no sharp corners ***in a particular cross-section***.  Indeed, the patent teaches that ***any*** etching defects expose nucleation sites and cause layer deterioration; that sharp corners lead to structural defects; and that these defects must be eliminated    Col. 1:66 – Col. 2:9.

Moreover, the specification provides evidence that "profile" refers to the "surface features" on the substrate.  Col. 30:32-36 ("This effectively converts the sharp corners into a sloped ***profile*** comprising a smooth rotation of micro-facets. The smooth ***surface feature*** in the present invention is essential for the deposition of low defect density structures suitable for device applications.")  (emphasis added); *see also* col. 4:13-16 ("The ***surface features*** in the present invention can be defined on the surface of various substrates using wet etching, dry etching and photoelectrochemical etching.") (emphasis added).  Lexington's proposed

construction uses the phrase "surface contour" to reflect the fact that the etching profile disclosed in the patent describes the substrate surface features.

In addition, the specification describes etching processes that result in a three-dimensional substrate contour. *See* cols. 4:8-13 ("For example, the patterned GaAs substrate is solvent cleaned and dipped in HCl to remove surface oxide, followed by isotropic etching in $H_2SO_4{:}H_2O_2{:}H_2O$ (10:1:1 by volume) or $Br_3/CH_3OH$ to produce a sloped etching profile comprising a smooth rotation of micro-facets."); 4:21-23 ("Alternatively, the masked substrate is directly dipped in an isotropic etchant to produce trenches with a curved etching profile."); and 5:53-55 ("The wafer is then subjected to isotropic etching to render a smooth etching profile suitable for layer deposition.")  A wafer subjected to isotropic etching will result in a contoured three-dimensional pattern on the surface of the wafer.

Moreover, as described above in connection with the term "etched trenches," the lower portion of the layer deposition takes place in the area of the trench and forms a contour on the textured district of the substrate.  That the patent drawings depict two-dimensional cross-sectional views does not imply that the claims refer to trenches that only contain a specific cross-section or trenches that only exist in a particular configuration.  *See LG Phillips LCD Co., Ltd. v. Tatung Co. of America, et al.*, No. CV-02-6775 (C.D. Cal. May 5, 2005) ("these figures do not in any way limit the extension of active layer 4 in the dimension perpendicular to the figure, or in other areas of the substrate not depicted in the cross-section views"); *see also Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration".)

Extrinsic evidence reveals that a profile may be construed as either an outline or a contour.  *See* Ex. E at E5 (defining a profile as, *inter alia*, "a view of anything in contour; outline".)  In addition, other patents in related fields of art have used two-dimensional drawings to represent three-dimensional substrate surface features.  *Compare, e.g.*, Ex. E at E23 *with* E24.

Finally, use of the term "cross-section" to represent "profile" is inappropriate for another reason.  While the patent has consistently used "profile" to apply to all aspects of the substrate pattern, a "cross-section" can be taken along any arbitrary plane of a substrate feature.  A substrate feature that has a smooth cross-section may, in fact, have sharp edges that do not appear as part of one cross-section, but would appear in another cross-section.  Therefore, use of the term "cross-section" invites ambiguity and confusion.

**A "smooth rotation of microfacets" is not a "gradual, incremental rotation in slope from microfacet to microfacet".**

Feit's proposed construction which includes the word "incremental" is not supported by the intrinsic or extrinsic evidence.  Further, it is contrary to the plain meaning of "smooth".  The word "smooth" implies continuous while "incremental" implies "stepwise" or discontinuous.

**The "sloped etching profile" applies to the feature on top of the base substrate**

The "sloped etching profile" should not be construed as requiring that the "etched trenches" consist ***entirely and exclusively*** of a "sloped etching profile."  The patent discloses embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B.  *See* cols. 5:16-17 and 6:10-11.  This position is more fully articulated in the construction of the term "having" below.

In summary, the intrinsic and extrinsic evidence reveals that the "sloped etching profile" should be construed as a "sloped surface contour".  In addition, as clearly described by the embodiments of the patent, the "with a smooth rotation of microfacets" should be construed to apply to the area "above the substrate base".  Moreover, Feit's mischaracterization of the "sloped

etching profile" as a "cross-section" should be rejected because it contradicts the intrinsic evidence and would lead to confusion and ambiguity.

### 6.   Having

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|------|-----------------------------------|------------------------------|
| having | comprising | consisting of |

**The intrinsic evidence reveals that "having" is an open term.**

The parties dispute whether the term "having" should be construed as open or closed. Claim 1 reads, in relevant part, "a textured district defined on the surface of said substrate comprising a plurality of etched trenches **having** a sloped etching profile… ." Col. 8:38-40 (emphasis added).[4]

The claim should not be construed as requiring that the "etched trenches" consist entirely and exclusively of a "sloped etching profile."  The patent discloses embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B.  *See* cols. 5:16-17 ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B") and 6:10-11 ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B").  Figure 2B, showing the base feature, is reproduced below:



Fig. 2B

---

[4] A Certificate of Correction deleted the comma that originally appeared at col. 8:38 after the word "surface".

Accordingly, Feit's proposal requiring that the etched trenches consist only of a sloped etching profile must be rejected. *See, e.g., Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claims in a way that excludes embodiments disclosed in the specification" absent a clear disclaimer) (citations omitted).

### 7.     Profile… without a prescribed angle of inclination

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| profile… without a prescribed angle of inclination | [No construction necessary], otherwise: surface contour... without a predetermined angle of inclination above the substrate base | cross-section . . . without a constant angle of inclination such that there are no linear portions |

**This claim term relates to three claim terms previously discussed above.**

Lexington contends that no construction is necessary. If the Court determines that construction of the term is necessary, then the parties disagree as to its construction. This term relates to three of the previous claim terms proposed for construction: (1) as stated above, the word *profile* refers to a three-dimensional contour as described in Lexington's contention detailed above for the term "sloped etching *profile* with a smooth rotation of microfacets"; (2) this term contains the word "prescribed" which means "predetermined" as described in Lexington's contention detailed above for the term "prescribed"; and (3) the *profile* relates to that surface contour that is above the base feature of the substrate, as described in Lexington's contention detailed above for the term "having".

**"Profile" means three-dimensional surface contour – <u>not</u> two-dimensional cross-section.**

Lexington's detailed contentions regarding the term "profile" appear above in connection with the term "sloped etching profile with a smooth rotation of microfacets". Lexington briefly summarizes its main points here. Feit's proposed use of "cross section" violates the patent's teaching that optimally, ***all*** sharp edges in the textured district must be eliminated. A skilled

artisan would recognize that the "essential" smoothness and absence of "sharp corner[s]" is required of the entire surface contour of the substrate and is not limited to a particular (or arbitrary) cross-section of the textured district.  The specification reveals that "profile" refers to the "surface features" on the substrate.  Col. 30:32-36; col. 4:13-16.  That the patent drawings depict two-dimensional cross-sectional views does not imply that the claims refer to trenches that only contain a specific cross-section or trenches that only exist in a particular configuration.  The dictionary definitions for "profile" include both *outline* or *contour*. *See* Ex. E at E5.  Finally, the use of the term "cross-section" invites ambiguity and confusion because a "cross-section" can be taken along any arbitrary plane.  In short, "profile," as used in the patent, is best defined as "surface contour."

### "Prescribed" means "predetermined".

Lexington's detailed contentions regarding the term "prescribed" appear above in connection with the term "prescribed".  Lexington briefly summarizes its main points here.  First, Feit's proposed construction must be rejected because construing "prescribed" as "constant" would render the term "sloped etching profile with a smooth rotation of microfacets" superfluous.  Second, the patent's use of "prescribed" comports with Lexington's proposed construction, i.e., "predetermined", or in some cases "determined" or "defined".  *See, e.g.*, cols. 1:67; 3:37-39; 4:62-63; and 7:57-58.  Third, the extrinsic evidence supports "predetermined".  The dictionary definition of "prescribed" is "to set down as a rule or direction; order; ordain; direct".  *See* Ex. B.  Thus, the plain meaning of "prescribed" requires a predetermination.  Additionally, the term "prescribed" has previously been construed as "predetermined" in other cases.

### Feit's "no linear portions" construction ignores plainly-disclosed embodiments.

Lexington's detailed contentions regarding the term "no linear portions" appear above in connection with the term "having". Feit's "no linear portions" construction must be rejected because the patent discloses embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B. *See* cols. 5:16-17 ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B") and 6:10-11 ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B"). Accordingly, Feit's proposal requiring "such that there are no linear portions" must be rejected.

**Feit's proposed construction, taken as a whole, contains superfluous limitations.**

Feit's proposed construction must be rejected because: (1) by definition, a cross-section without a ***constant*** angle of inclination would require a curved surface; and (2) by definition, the absence of any linear portions would also require a curved surface. Using Feit's proposed construction, both limitations would require a curved surface – another reason that Feit's proposed construction must be rejected. *See Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (construing claims to avoid rendering other claim terms superfluous).

In summary, the intrinsic and extrinsic evidence reveals that the "profile" refers to a "surface contour" and that the substrate pattern is optionally spaced by a base feature. In addition, as clearly described by the embodiments of the patent, the "with a smooth rotation of microfacets" should be construed to apply to the area "above the substrate base". Accordingly, only Lexington's construction is consistent with the intrinsic and extrinsic evidence, and should be adopted.

### 8.     First layer… comprising a plurality of inclined lower portions

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|------|-----------------------------------|------------------------------|

| Term | Lexington's Proposed Construction | Feit's Proposed Construction |
|---|---|---|
| first layer… comprising a plurality of inclined lower portions | [No construction necessary], otherwise: first layer having lower portions that contain inclines | first layer . . . comprising two or more portions that grow from adjacent slopes of the trench so as to meet and combine in the trench region |

**The claim terms do not require that layers be grown in any specific way or order.**

Lexington contends that no construction is necessary. If the Court determines that construction of the term is necessary, then the parties disagree as to the meaning of "inclined lower portions". Feit appears to require that the "inclined lower portions" actually be inclined lower *layers* or *sublayers*. However, the patent contains no such requirement. There is no "manifest exclusion or restriction" in the record such as may evidence an intention that "inclined lower portions" of the first layer must be grown in any specific way. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1382 (Fed. Cir. 2009). To the contrary, the patent states that "[t]he epilayer deposition is solely determined by the growth chemistry". Col. 3:41-42.

The patent describes planar layers. *See, e.g.*, col. 4:47-55:

FIG. lA is a cross-sectional view showing initial layer deposition over the textured substrate surface in accordance with the embodiment of the present invention. The layer deposition proceeds in a manner such that the inclined layers 12 emerging from the adjacent slopes meet and combine in the trench region. As the growth proceeds, the inclined growth diminishes and the upper section 14 of the structure becomes planar as shown in FIG. lB.

In essence, the layer is comprised of an upper planar portion and a lower inclined portion. The patent differentiates between the upper and lower portions of the layer to advise the reader that the invention is thought to reduce lattice mismatch defects because the lower sloped edges of the layer guide the defects towards the center of the trench as shown in Figure 1C.

The reason that there is a plurality of lower portions is because the lower portion "fills in" the lower area of the textured district of the substrate, and as recited in claim 1, the textured district of the substrate comprises "a plurality of etched trenches". The plurality of etched

trenches on the face of the substrate leads to the formation of a plurality of lower inclined portions.  Further, although the patent describes a way of performing the layer deposition, it is not limiting.  Col. 2:15-18 ("The controlled layer deposition over the textured surface district proceeds such that the inclined layer growth in the trench region diminishes in the early stage of the process.")

Contrary to Feit's assertion, there is no requirement that the inclined lower portions grow from adjacent slopes of the trench so as to meet and combine in the trench region.  Indeed, the trench may not contain adjacent slopes.  As discussed above in connection with the term "having", the patent discloses embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B.  *See* cols. 5:16-17 and 6:10-11.  The base features may prevent the trench slopes from being adjacent.  *See, e.g.*, Ex. D at D24 (wherein Figure 2c depicts an initial grown GaN layer in which the sides are spaced by a base feature). Accordingly, Feit's proposed requirement that the inclined lower portions grow from adjacent slopes of the trench so as to meet and combine in the trench region must be rejected.  *See, e.g., Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claims in a way that excludes embodiments disclosed in the specification" absent a clear disclaimer) (citations omitted).

Moreover, the claim does not restrict the manner in which the inclined lower portions must grow.  While the patent may disclose one or more preferred embodiments or one or more preferred modes of carrying out the invention, the claim cannot be construed to be limiting. Accordingly, the Court should reject Feit's attempt to incorporate limitations of a preferred embodiment into the claims.  *See Falana v. Kent State Univ.*, 669 F.3d 1349, 1355 (Fed. Cir. 2012) (cautioning against importing limitations from a preferred embodiment into the claims).

## VII.        CONCLUSION

For the foregoing reasons, Lexington respectfully requests that the Court adopt

Lexington's proposed constructions.


DATED: March 25, 2013                     Respectfully submitted,

                                          **LEXINGTON LUMINANCE LLC**,
                                          By its attorneys,

                                          /s/ *Robert D. Katz*
                                          David S. Godkin  (BBO#196530)
                                          Anne Marie Longobucco (BBO#649299)
                                          BIRNBAUM & GODKIN LLP
                                          280 Summer Street
                                          Boston, MA 02210
                                          617-307-6100
                                          godkin@birnbaumgodkin.com
                                          longobucco@birnbaumgodkin.com

                                          Robert D. Katz
                                          KATZ PLLC
                                          6060 N. Central Expressway, Suite 570
                                          Dallas, TX 75206
                                          214-865-8000
                                          rkatz@katzlawpllc.com


### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on the above date.


                                          /s/ *Robert D. Katz*
                                          Robert D. Katz