**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **LEXINGTON LUMINANCE LLC** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **No. 1:12-cv-11554-WGY** |
| | § | |
| **FEIT ELECTRIC COMPANY, INC.** | § | **JURY DEMANDED** |
| | § | |
| *Defendant*. | § | **REQUEST FOR ORAL** |
| | § | **ARGUMENT** |

**DEFENDANT FEIT ELECTRIC'S OPENING
CLAIM CONSTRUCTION MEMORANDUM**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND OF THE TECHNOLOGY ....................................................................1

III.    THE PATENT-IN-SUIT...........................................................................................3

IV.     LAW OF CLAIM CONSTRUCTION.............................................................................5

V.      DISPUTED TERMS .................................................................................................5

        A.      "Etched Trenches" .....................................................................................5

        B.      "Microfacets"............................................................................................9

        C.      "Sloped Etching Profile With a Smooth Rotation of Microfacets".......................12

        D.      "Prescribed" / "Profile . . . Without a Prescribed Angle of Inclination" ...............17

        E.      "Having" .................................................................................................20

        F.      "First Layer . . . Comprising a Plurality of Inclined Lower Portions"...................22

        G.      "Layer"...................................................................................................24

VI.     **CONCLUSION** .....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) ................................................................ 14

*Bose Corp. v. Lightspeed Aviation, Inc.*,
    707 F. Supp. 2d 141 (D. Mass. 2010) ....................................................... 5

*Bose Corp. v. SDI Tech., Inc.*,
    828 F. Supp. 2d 415 (D. Mass. 2011) ....................................................... 5

*Control Resources, Inc. v. Delta Elec., Inc.*,
    133 F. Supp. 2d 121 (D. Mass. 2000) ....................................................... 1

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ........................................................ 13, 17

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) .............................................................. 14

*O2 Micro Int'l Ltd. V. Beyond Innovation Tech. Col., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ........................................................ 17, 22

*Pagemelding, Inc. v. Feeva Tech., Inc.*,
    2009 WL 2588883 (N.D. Cal. Aug. 19, 2009) .......................................... 9

*Parallel Networks, LLC v. Abercrombie & Fitch*,
    2011 WL 3609292 (E.D. Tex. Aug. 12, 2011) ......................................... 11

*Rolls-Royce, PLC v. United Techs. Corp.*,
    2011 WL 1949662 (E.D. Va. May 20, 2011) .......................................... 21

I.      **INTRODUCTION**

The parties dispute the meaning of eight claim terms in U.S. Patent No. 6,936,851 ("the '851 patent").[1] These terms are all from claim 1, the only claim Lexington Luminance LLC ("Lexington") has asserted against Feit Electric Company, Inc. ("Feit Electric").  Feit Electric's proposed constructions for these terms are firmly grounded in what one of ordinary skill in the art reading the claims, the specification, and the prosecution history would understand the disputed claim terms to mean.  The extrinsic evidence, in particular the common meaning of non-technical terms, often reinforces the meaning of terms found in the intrinsic evidence.  Feit Electric has also kept in mind that its constructions should be helpful both to the Court and a lay jury.  *See Control Resources, Inc. v. Delta Elec., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2000).

In contrast, the intrinsic and extrinsic evidence does not support Lexington's proposed constructions, which often seek to expand the meaning of the disputed terms well beyond their reasonable scope.  Some constructions are too vague and read out important claim limitations.  Other constructions are overly complex and confusing.  None of the construction would be helpful to a Court and jury in understanding the claims.  For these reasons, detailed below, the Court should reject Lexington's constructions and adopt Feit Electric's constructions.

II.     **BACKGROUND OF THE TECHNOLOGY**

The '851 patent relates generally to solid-state light-emitting devices such as light-emitting diodes ("LEDs").[2]  An LED is composed of thin layers of semiconducting material that emits light when current is passed through these layers.  To manufacture LEDs, the thin

---

[1] A copy of the '851 patent is provided as Exhibit 1.  The disputed claim terms and the parties' proposed constructions are provided for convenience as Exhibit 2.

[2] The Background of the Technology section draws generally from E. Fred Schubert, *Light-Emitting Diodes* 123-126, 222-236 (2nd ed. 2006).

layers of semiconducting material are sequentially deposited on a circular wafer of material called a substrate, which is later processed and diced to create hundreds of individual LEDs. This initial deposition process on the substrate, called layer growth, is performed by introducing gases containing the materials that make up the layer into a growth chamber with the substrate at high pressures and temperatures.

The substrate layer and the grown layers are crystalline. The atoms that make up the layers will bond atom-by-atom to each other to grow the crystalline layers from bottom to top. Ideally, layers are grown on substrates composed of the same material. In that case, the substrate layer and the grown layers have identical crystal lattice structures: the same atoms make up the crystal and the distances between those atoms are identical. Such similarity in crystal structures reduces the formation of defects at the interface between the substrate and the layers. In practice, however, it is sometimes prohibitively expensive or difficult to prepare a substrate of the same material as the desired semiconducting layers. In that case, the layers are grown on a substrate with a similar but not identical lattice structure. In other words, the substrate and the layers are lattice-mismatched. For example, gallium nitride ("GaN") is a very desirable semiconducting material for making LEDs that emit blue and green light. But traditionally it has been too expensive and difficult to first create a GaN substrate. Instead, GaN layers have often been grown on substrates made of industrially manufactured sapphire or silicon, both of which have similar but not identical lattice structures to GaN.

In a lattice-mismatched system, the atoms of the growing layer do not align perfectly with the atoms comprising the substrate. Compared with the substrate, the layer may have different spacing between the atoms as well as atoms with different sizes. As a result, growing the layer on the mismatched substrate creates strain in the lattice structure of the growing layer.

This strain can create what are called threading dislocations.  These are essentially extended

defects (i.e., cracks) in the crystalline structure of the layer that will extend or propagate along

the direction of layer growth.

These threading dislocations can cause problems.  LEDs comprise many different layers

grown one on top of the other.  By changing the types and ratios of gases that are introduced into

the growth chamber, the material composition of the grown layers can be changed.  One of the

most important layers in an LED is the active layer.  This is the layer that emits light in a

finished LED.  The more threading dislocations that reach the active layer, the less efficient the

LED will be.  The dislocations provide a path to generate heat rather than light and excess heat

can lead to further deterioration of the LED.  Optimizing growth conditions and parameters can

help reduce the formation of dislocations.  Specialized layers, such as a buffer layer grown

between the substrate and the other layers, can also dramatically reduce the formation of

dislocations.  As explained below, the '851 patent discusses techniques, including prior art

techniques, for allegedly decreasing the formation of dislocations by growing layers on specific

types of textured substrates.

III.    **THE PATENT-IN-SUIT**

The '851 patent is titled "Semiconductor Light-Emitting Device and Method for

Manufacturing the Same."  The '851 patent describes a technique for allegedly decreasing the

number of threading dislocations that reach the active layer in a lattice-mismatched LED.  (Ex. 1,

1:8-15.)  In one embodiment, shown for example in Figures 1A-1C, two or more trenches are

etched into the surface of the substrate.  (*Id*., 3:46-59.)  These trenches are then processed to

eliminate sharp corner and create a rounded, smooth surface down to the microfacet level.  (*Id*.,

2:28-34; 4:5-36.)  Because the trenches are smooth down to the microfacet level, layers grow

more evenly and with fewer dislocations than a trench that may appear smooth on a macro level

but actually have chaotic, rough microfaceting.  (*Id.*, 2:1-8, 2:23-26.)  Allegedly because the

trenches have rounded bottoms and sides, portions of the layer during initial layer growth on the

substrate will grow at an incline from the sloped portions on both sides of the trench under

certain growth conditions.  (*Id.*, 4:46-61.)  As layer growth proceeds, these inclined portions will

eventually merge into each other and create a flat surface for further layer growth.  (*Id.*)

According to the '851 patent, any dislocations that are formed in these opposing inclined

portions on either side of the trench will travel at an incline along the path of layer growth and

eventually merge with other dislocations coming from the other side or with dislocations coming

up from the middle of the trench.  (*Id.*)  In theory, according to the '851 patent, this decreases the

number of dislocations that reach the active layer.  (*Id.*)

The '851 patent briefly describes another embodiment, for example in Figures 2A-C,

where the mesas between the trenches, rather the trenches themselves, are rounded and have a

smooth rotation of microfacets.  (*Id.*, 5:11-20.)  The '851 patent also describes embodiments, for

example in Figures 3A-7C,  where the mask used in etching trenches or mesas is not removed

before growing the layers.  (*Id.*, 5:35 – 8:34.)  The embedded mask blocks dislocations.  (*Id.*)

None of this is really new.  The '851 patent itself points to prior art that used textured

districts, including inclined planes (having linear cross-sections) that direct dislocations, to

reduce the number of dislocations that reach the active layer.  The '851 patent alleges that its

invention is different from the prior art in that its features are rounded at the macro level (so as to

direct dislocations together) and smooth on the microfacet level (so as to decrease defects on the

surface of the features that can generate dislocations).  The invention as claimed in Claim 1 is

specifically directed to the curved-profiled trench of Figures 1A-C, which is smoothed down to

the microfacet level.

IV.     **LAW OF CLAIM CONSTRUCTION**

This Court is familiar with the law of claim construction and this memorandum incorporates by reference the overviews of claim construction principles found in this Court's recent opinions.  *See, e.g.*, *Bose Corp. v. Lightspeed Aviation, Inc.*, 707 F. Supp. 2d 141, 143 (D. Mass. 2010); *Bose Corp. v. SDI Tech., Inc.*, 828 F. Supp. 2d 415, 417-18 (D. Mass. 2011).

V.      **DISPUTED TERMS**

The parties have agreed to constructions of four claim terms in claim 1 of the '851 patent. (*See* Ex. 3.)  These agreed constructions are supported by the intrinsic evidence in this case, and Feit Electric respectfully asks the Court to adopt them.

The parties dispute eight claim terms, two of which overlap.  (*See* Exhibit 2.)  Thus, there are seven issues of claim construction for the Court to decide.  As discussed below, Lexington argues that two of the more complex terms do not require construction.  But there is clearly a dispute between parties over the meaning of these terms, and given their complexity they should be construed to help the Court and lay jury understand the scope of the asserted claim.

A.      **"Etched Trenches"**

| Term | Feit Electric's Construction(s) | Lexington's Construction(s) |
|---|---|---|
| "etched trenches" | "etched elongated stripes" | "an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate" |

The dispute here is over what the claimed "trench" looks like when viewed from above (*i.e.*, the top-down view).  The specification and the common meaning of "trench" supports Feit Electric's construction that "etched trenches" are "etched elongated stripes."  This construction is straight-forward, clear, and well-supported by the evidence.

The term "etched trenches" first appears in the second limitation of Claim 1:

> a textured district defined on the surface, of said substrate
> comprising a plurality of **etched trenches** having a sloped etching
> profile with a smooth rotation of microfacets without a prescribed
> angle of inclination;

(Ex. 1, Claim 1.)  The term "trench" or "etched trenches" also appears in other claims.  (*See, id.*, Claim 4 ("chirped trench array"); Claim 5 ("etched trenches"); Claim 12 ("etched trenches"); Claim 13 ("etched trenches" and "narrow trenches").)  The claims alone do not provide any further explanation of the meaning of a "trench."

The specification, however, explicitly describes the structure corresponding to the trenches (as opposed to the mesas between the trenches) as being "stripes" or "stripe features." (*Id*., 2:30-32 ("the stripe or mesa features become naturally rounded and free of surface irregularities"); 3:48-50 ("mesa or stripe features are first defined over the surface of the substrate using conventional photolithography etching methods"); 3:54-58 ("For example, stripes along the [011] or the [01$\underline{1}$] direction are defined on the (100)GaAs surface using a resist mask or nitride mask following by wet etching in an isotropic etchant such as $H_2SO_4:H_2O_2:H_2O$ (10:1:1 by volume).").)

The patent figures are also consistent with the "trenches" being stripes.  For example, Figure 1A is a cross-sectional view of two trenches in the surface of the substrate (labelled "10").



-6-

(*Id*., Fig. 1A (annotated).)  The purpose of these smooth, round-bottomed trenches is to direct

layer growth at an incline from two opposing slopes so that defects meet in the middle of the

trench.  (*See id.*, Claim 1 (the trenches create "a plurality of inclined lower portions so as to

guide the extended lattice defects away from propagating into the active layer").)  To accomplish

this, the trench is symmetrical along its length so that inclined portions growing from the sloped

side are directed toward each other and can merge together.  (*See, e.g.*, *id*., 4:46-61.)  Thus,

extrapolated to three-dimensions, the trenches depicted in Figure 1A form two parallel stripes in

the surface of the substrate, as shown in this figure:



Every other cross-sectional view in the patent figures is similarly consistent with the

depicted trenches being parallel "stripes."  (*See, e.g.*, *id*., Figs. 1B-C, 3A-C, 5A-C, 6A-C, 7B-C.)

That these figures show cross-sections of "stripes" is reinforced by Figure 7A, the only top-down

figure, and Figure 7B (a cross-section also showing the Figure 7A mask).



(*Id.*, Figs. 7A & 7B (annotated).)  Figure 7A is a top-down view, showing a bridging mask over

the center of two parallel striped trenches, as seen in the cross-sectional view of this same

embodiment in Figure 7B.  That the "etched trenches" are "elongated stripes" is apparent from

the shape of the mask shown in the top view in Figure 7A and the cross-section in Figure 7B

(and Figure 7C, which shows the same embodiment after smoothing and rounding the trenches).

Other parts of the claims and specification are consistent with the trenches being stripes.

For example, claims and specification discuss dividing a wide trench into a "plurality of narrow

trenches."  (*See id.*, Claim 13; 6:24-31.)  Unlike other shapes, a stripe (which has a constant

length and width) can be subdivided into a plurality of narrower stripes (which implies that the

stripes have the same length as the original stripe, just a narrower width).  Finally, although the

'851 patent does use trench in a more specialized context, dictionary definitions of "trench" are

at least consistent with it describing an elongated "stripe" feature when viewed from above.[3]

---

[3] *See, e.g.*, *Merriam-Webster Online*, http://www.merriam-webster.com/dictionary/trench (a
"trench" is "a long cut in the ground"); *Online Dictionary*, http://oxforddictionaries.com/us/
definition/american_english/trench (a "trench" is "a long, narrow ditch").

Lexington's construction of "etched trenches" as "an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate" is overbroad and has no basis in the intrinsic or extrinsic evidence.  Lexington essentially replaces "trenches" with "an area" or "a pattern."  This reads out the concept of "trenches" from the claims in a litigation-driven attempt to cover any type of etched pattern whatsoever.  *Pagemelding, Inc. v. Feeva Tech., Inc.*, 2009 WL 2588883, at *9 (N.D. Cal. Aug. 19, 2009) ("Plaintiff's construction is rejected because it significantly broadens the claim terms beyond what was provided for in the specification.").  Lexington's construction would read on a boundless variety of structures that would bear no resemblance to a "trench" as described in the intrinsic evidence or as that term is commonly used.  In other words, there is no support anywhere in the claims, specification, or prosecution history for reading "trench" so broadly. (Nor would such structures necessarily perform the intended function of the invention.) Similarly, the common understanding of "trench" as a long and narrow depression or ditch is entirely inconsistent with Lexington's construction.

In sum, all of the intrinsic and extrinsic evidence supports "etched trenches" being construed as "etched elongated stripes."  The Court should, therefore, reject Lexington's litigation-driven construction.  Feit Electric respectfully asks the Court to adopt its construction of "etched trenches," which is overwhelmingly supported by the intrinsic and extrinsic evidence.

**B.    "Microfacets"**

| Term | Feit Electric's Construction(s) | Lexington's Construction(s) |
|---|---|---|
| "microfacets" | "planar surfaces on the order of microns in size" | "very small planes that make up a surface contour" |

Both parties agree that "microfacets" are planar surfaces or planes.  The main dispute between the parties is whether these planar surfaces are on the micron (*i.e.*, micrometer) scale

(Feit Electric's position) or whether they are merely "very small" (Lexington's position).  A secondary dispute is whether a "microfacet" always makes up a "surface contour," as Lexington proposes.

The meaning of "microfacet" is not apparent from the context in which it is used in the claims, specification, and prosecution history.  Rather, "microfacet" is a term of art in the material sciences that one of ordinary skill in the art would understand.  For example, one of ordinary skill would know that the semiconductor materials that make up the substrate and layers of an LED are crystalline.  And like crystals, such as a cut gem, the surface of these materials consists of facets—flat or planar surfaces.  These facets can be different sizes.  In the field, a facet on the nanometer scale is referred to as a "nanofacet."  (*See, e.g.*, Ex. 4 (using "nanofacet" to describe facets on a sapphire substrate on the nanometer scale).)  A larger facet, on the micrometer or micron scale, is referred to as a "microfacet."  (*See, e.g.*, Ex. 5 (using "microfacet" to describe facets on the micrometer scale, for example in Figure 1); Ex. 6 (using "microfacet" to describe facets of a "few micron-width" on striped GaN templates).)  Had the patentee not intended to quantify the scale of such facets, he could have simply referred to them as "facets," without the inherent quantification of scale inherent in the term *micro*facets.

None of the uses of "microfacet" in the intrinsic evidence suggests that the patentee was seeking to use the term in a way different than it is commonly used in the field.  (Ex. 1, 3:35-37 ("The textured surface district comprises a plurality of etched features such as trenches and mesa having a smooth rotation of micro-facets"); 3:39-41 ("Instead, a spectrum of micro-facets is exposed to allow preferential layer nucleation over facets with energetically favorable sites."); 4:12-13 ("sloped etching profile comprising a smooth rotation of micro-facets"); 4:32-34 ("This effectively converts the sharp corners into a sloped profile comprising a smooth rotation of

micro-facets.").)  The patentee selected the microfacet terminology, as distinct from "facets" in general or "nanofacets."  Lexington's attempts to broaden the terminology selected by the patentee should be rejected.

Lexington's construction places no boundary on the size of the facets, merely stating that they are "very small."  But everything about an LED is "very small."  LEDs themselves typically fit on the end of your finger; the layers and features within the LED are even smaller.  And "very small" fails to differentiate, for example, "microfacets" from "nanofacets," or from "facets" in general.  Moreover, courts have criticized constructions that use vague size terms.  *See Parallel Networks, LLC v. Abercrombie & Fitch*, 2011 WL 3609292, at *3 (E.D. Tex. Aug. 12, 2011) (the term "small" in proposed construction is "vague and possibly indefinite").  Merely saying that "microfacets" are "very small" is certainly vague and possibly indefinite here.  It gives an alleged infringer, or a lay jury, very little guidance on how to determine whether something is "very small" in the context of the claim.

Lexington's construction also describes the "microfacets" as making up "a surface contour."  There is no mention of a "surface contour" in the specification or claims, and Lexington's contrived construction finds no support in the intrinsic record.  Even if a "surface contour" were understandable, nothing in the intrinsic evidence limits microfacets to only those planes making up a surface contour.

In short, Feit Electric's proposed construction is well supported by the evidence and helpful to a jury.  In contrast, Lexington's construction finds no basis in the evidence, removes an important limitation inherent in the term "microfacet," and is otherwise unhelpful.  Feit Electric's construction should be adopted.

C.      **"Sloped Etching Profile With a Smooth Rotation of Microfacets"**

| Term | Feit Electric's Construction | Lexington's Construction |
|---|---|---|
| "sloped etching profile with a smooth rotation of microfacets" | "etched cross-section without sharp corners and with a gradual, incremental rotation in slope from microfacet to microfacet" | "sloped surface contour without sharp corners above the substrate base" |

There are two disputes here.  First, the parties dispute whether a "sloped etching profile" is an "etched cross-section" (Feit Electric's position) or a "surface contour . . . above the substrate base" (Lexington's position).  The intrinsic evidence supports a "profile" being a "cross-section"; it does not support it being a "surface contour . . . above the substrate base." Second, the parties dispute how "a smooth rotation of microfacets" should be defined.  Both parties agree that there are no "sharp corners" in a "smooth rotation of microfacets."  But this only captures the "smooth" aspect of this phrase.  The intrinsic evidence supports that this term also describes there being a "gradual, incremental rotation in slope from microfacet to microfacet."

1.      **An "etching profile" is an "etched cross-section"**

Turning first to the claim language itself, each trench in the textured district on the surface of the substrate has a "sloped etching profile":

> [Claim 1] . . . a textured district defined on the surface, of said substrate comprising a plurality of etched **trenches having a sloped etching profile** with a smooth rotation of microfacets without a prescribed angle of inclination

(Ex. 1, Claim 1.)  The specification makes clear that a trench's "profile" is its "cross-section." For example, the specification generally describes each of its side-view figures as a "cross-sectional view."  (*Id.*, 2:59; 2:64; 3:1; 3:1; 3:11; 3:26-27.)  The specification also refers to this same type of figure as showing a "crystallographic **etching profile**."  (*Id.*, 3:20-21.)  Every other

-12-

use of "etching profile" or "profile" in the specification is consistent with them being "cross-sections" of the trenches.  For example, the profiles are consistently described as being "curved," "sloped," or "smooth," which makes sense when looking at a cross-section of the trench.  (*Id.*, 3:58-59 ("the etching is diffusion limited resulting in a **curved etching profile**"); 4:10-13 (isotropic etching produces "a **sloped etching profile** comprising a smooth rotation of micro-facets"); 4:21-23 ("the masked substrate is directly dipped in an isotropic etchant to produce trenches with a **curved etching profile**"); 4:32-34 ("This effectively converts the sharp corners into a **sloped profile** comprising a smooth rotation of micro-facets"); 5:53-55 ("The wafer is then subjected to isotropic etching to render a **smooth etching profile** suitable for layer deposition").)

In contrast to Feit Electric's well-supported construction, Lexington equates a "profile" with a "surface contour . . . above a substrate base" which has no basis in the intrinsic evidence. There is simply no discussion at all in the specification or prosecution history equating a "profile" with a "surface contour."  It is also unclear what Lexington means by "substrate base." The specification does mention embodiments, such as those shown in Figures 2B and 4B, that have a "base feature" between rounded mesas.  But these rounded mesa embodiments are different than the trench embodiments covered by the claims.  In short, there is no basis for reading in a "substrate base" into the claims.

A final problem with Lexington's construction of "etching profile" as "surface contour" is that it reads out any concept of "etching."  The term "etching" is presumed to mean something in "etching profile" and cannot be arbitrarily dropped.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[A]ll claim terms are presumed to have meaning in a claim"); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364,

1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").

> 2. **A "smooth rotation of microfacets" is a "gradual, incremental rotation in slope from microfacet to microfacet" so that there are no "sharp corners"**

Before looking at the intrinsic evidence, it helps to understand what a "rotation" is in the context of patent.  In mathematics, a "rotation" is "the action or process of rotating on or as if on an axis or center."[4]  For example, a rotation of a line (representing a side-view of a plane, like a microfacet) around a fixed point will produce a rounded shape, as shown in the figure below.



Another way to describe the same geometric relationship is to say that the slope between adjacent lines rotates with respect to each other.

The language of claim 1 requires a "**sloped** etching profile with a **smooth rotation of microfacets**."  (Ex. 1, Claim 1.)  Based on the intrinsic evidence, this means that the profile is "without sharp corners" and has a "gradual, incremental rotation in slope from microfacet to microfacet."  The specification explains that when a substrate is etched, surface defects caused by the etching can lead to defects in layer growth:

---

[4] *See Merriam-Webster Online*, http://www.merriam-webster.com/dictionary/rotation.

> The etching defects expose random nucleation sites causing adverse microfaceting and layer deterioration.  Thus structural defects are inevitably generated as the growth front attempts to negotiate surface defects with **sharp corners and abrupt changing curvature**.

(*Id.*, 2:1-6.)  To solve this problem, the specification proposes performing a process called a "thermal anneal" to smooth out sharp corners thereby creating rounded stripe (*i.e.*, trench) and mesa features:

> In the present invention, the substrate is patterned using conventional lithographic methods, followed by **thermal anneal to smooth out sharp corners and etching defects**.  After thermal etching and solid-state diffusion, **the stripe or mesa features become naturally rounded and free of surface irregularities**.  The textured surface district thus obtained is essential for the growth of smooth layers without the occurrence of chaotic miro-faceting.

(*Id.*, 2:27-34.)  The specification uses the term "smooth rotation of microfacets" to capture both the concept of smoothing out sharp corners and rounding the stripe (i.e., trench) or mesa features.  For example, the specification explains that in an illustrative embodiment "the substrate is further etched after stripping off the etch mask **to reduce surface trenches and mesa to desirable shapes**."  (*Id.*, 4:5-8.)  This is done by a subsequent "isotropic etching . . . to produce a sloped etching profile comprising a **smooth rotation of micro-facets**."  (*Id.*, 4:5-13.)  The specification also discusses performing a thermal anneal "to polish off **sharp corners and etching defects**" which "effectively converts the sharp corners into a sloped profile comprising a **smooth rotation of micro-facets**."  (*Id.*, 4:25-34.)

On the micron scale, adjacent microfacets will have slopes in relation to each other.  A "smooth" rotation means a gradual or incremental change in slope from microfacet to microfacet.  This figure below shows a blow-up of a part of the cross-section of a trench with a smooth rotation of microfacets:



In contrast, a profile that may appear smooth at a macro (or larger) scale may in fact have sharp corners and etching defects when viewed on the microfacet (micro) level. There is not a gradual rotation of slopes between microfacets. Instead, the slopes between the microfacets change dramatically creating sharp corners. For example, the figure below shows an example of the sharp corners and surface defects on a microfacet level that the patented invention is allegedly designed to avoid.



Not only does Lexington's construction fail to account for the rotation in slope on the microfacet level, it reads the term "microfacets" completely out of the claim. The term "microfacet" is presumed to mean something and cannot be arbitrarily stripped from the claim. *See Innova/Pure Water*, 381 F.3d at 1119 (Fed. Cir. 2004) ("[A]ll claim terms are presumed to have meaning in a claim").

In sum, only Feit Electric's construction of "sloped etching profile with a smooth rotation of microfacets" properly aligns with the intrinsic evidence and should be adopted .

### D.     "Prescribed" / "Profile . . . Without a Prescribed Angle of Inclination"

| Term(s) | Feit Electric's Construction(s) | Lexington's Construction(s) |
|---------|--------------------------------|----------------------------|
| "prescribed" | "constant" | "predetermined" |
| "profile . . . without a prescribed angle of inclination" | "cross-section . . . without a constant angle of inclination such that there are no linear portions" | No construction necessary, otherwise "surface contour . . . without a predetermined angle of inclination above the substrate base" |

As a preliminary manner, the claim phrase "profile . . . without a prescribed angle of inclination" should be construed. The parties have very different understandings of what this phrase means. Where the parties actually dispute the proper construction of a claim term, a court must still construe the term necessary to resolve the parties' dispute, rather than let an issue of claim interpretation be decided by the jury. *O2 Micro Int'l Ltd. V. Beyond Innovation Tech. Col., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Moreover, this complex claim language will most certainly not be readily understood by the jury without the Court's guidance and construction.

The evidence supports Feit Electric's construction. As discussed above, the "profile" of a trench is a view of its "cross-section." The asserted claim covers trenches with a cross-section

that lacks a "prescribed angle of inclination."  As explained below, the absence of a "prescribed

angle of inclination" is simply a geometric description of a curved profile or cross-section

without linear portions.  In geometry, an "angle of inclination" is "the angle formed by the x-axis

and a given line (measured counterclockwise from the positive half of the x-axis)."[5]  The figure

below shows lines with angles of inclination of 45 degrees, 0 degrees, and -45 degrees.



A "prescribed angle of inclination" is a set, fixed, or constant angle of inclination.  Thus,

a straight line has a constant (or prescribed) angle of inclination in relation to the x-axis whereas

a *slope* or *curve* does not.  Rather a curve has a continuously varying (*i.e.*, non-constant) angle of

inclination at every point along the curve.  The specification distinguishes the invention from

prior art that used a specific or "prescribed" angle of inclination:

> This restraint can be relaxed somewhat by depositing the layers
> over etched surface features with a specific inclination angle.
> However, the layer disposition over prescribed surface feature is
> highly sensitive to the etching defects.

(Ex. 1, 1:64-2:1.)  In contrast, the specification explains that the trenches in the embodiments

lack a prescribed angle of inclination.  (*Id.*, 2:22-25 ("The textured district in the present

invention comprises a plurality of smooth trenches without a prescribed angle of inclination.");

3:37-39 ("the direction of inclined layer growth is not uniquely prescribed by mesa etching").)

---

[5] *See, e.g.*, *Free Dictionary Online*, http://www.thefreedictionary.com/angle+of+inclination.

In discussing the trench embodiment, the specification states that "[i]n contrast to the prior art methods, there is no prescribed **plane** for the layer to grow." (*Id.*, 4:62-63 (emphasis added).)  A plane depicted in cross-section as a line, and thus the specification makes clear that the trenches or mesas of the invention have no such planar surfaces.  Instead, the disclosed trenches and mesas are "curved" and "rounded" with a "smooth rotation of microfacets." (*Id.*, 2:30-32; 3:58-59; 4:21-23.)  Thus, based on this discussion, a "prescribed" angle of inclination is a set or constant angle.  The term "angle of inclination" would not likely be familiar to a lay jury.  Thus, Feit Electric's construction explains the implication of a profile not having any constant angle of inclination: the cross-section would lack linear portions.

Lexington's constructions of "prescribed" and "profile . . . without a prescribed angle of inclination" are not supported by the intrinsic evidence.  First, a "profile" is not a "surface contour" for the reasons explained previously.  (*See* C.1 above.)  Moreover, it makes no sense to describe a "surface contour" – a three-dimensional structure – by its angle of inclination.

Second, construing "prescribed" to mean "predetermined" is unhelpful, ambiguous, and inconsistent with the intrinsic evidence.  The word "predetermine" commonly means "to settle or decide in advance."[6]  Therefore, Lexington is proposing that the profile lacks an angle of inclination that is settled in advance.  Of course, this makes no sense in the context of the invention, which is directed to the geometry of the trenches, not to the temporal predetermination of its structure and shape.  The design of every light-emitting device will be settled or determined in advance.  However, the invention is directed to the structure of that design, not "when" it is determined.

_____

[6] *See, e.g.*, *Dictionary.com*, http://dictionary.reference.com/browse/predetermined.

Third, Lexington again seeks to broaden the claim to cover embodiments in which the trenches have linear portions, such as the Figure 2B embodiment. It does so by introducing the concept of a "substrate base" into the claim. The concept of a "substrate base" is not present in the specification, and as explained above, the claims describe the curved trench embodiment of, for example, Figures 1A–C. The claims do not cover the embodiment described in Figure 2B, having curved mesas rather than curved trench cross-sections or profiles. Lexington thus seeks to read this claim element on only a portion of the "profile" rather than its entirety. Nothing in the claims supports that the "profile" pertains to only the sides and not the entirety of the trench profile. Claim 1 is directed to the trench embodiment of Figure 1, and not to the mesa embodiment of Figure 2, in which the profile quite clearly includes linear portions having a "prescribed angle of inclination."

In sum, Feit Electric's constructions of "prescribed" and "profile . . . without a prescribed angle of inclination" are well-supported by the intrinsic and extrinsic evidence. In contrast, Lexington's proposed construction of "prescribed" as "predetermined" is ambiguous and inconsistent with the specification. Similarly, Lexington's construction of the broader phrase "profile . . . without a prescribed angle of inclination" is unhelpful and inconsistent with the claims and specification, and seeks to encompass structures that claim 1 was intended to exclude.

E.     "Having"

| Term(s) | Feit Electric's Construction(s) | Lexington's Construction(s) |
|---------|--------------------------------|----------------------------|
| "having" | "consisting of" | "comprising" |

The term "having" may be a transitional phrase (like "comprising" or "consisting of") that can either be open (like "comprising") or closed (like "consisting of") depending on the

context.  (*See* Manual of Patent Examining Procedure § 2111.03.)  The dispute here is over what "having" means in the claim phrase "etched trenches **having** a sloped etching profile with a smooth rotation of microfacets without a prescribed angle of inclination."

Feit Electric's position is that "having" is closed such that the entire sloped etching profile of each trench must have a smooth rotation of microfacets and no prescribed angle of inclination.  This is supported by the intrinsic evidence.  Lexington's position is that "having" is open such that only a portion of the sloped etching profile need have a smooth rotation of microfacets and no prescribed angle of inclination.  In other words, Lexington's position is that the profile of the trench may have sharp corners, rough microfaceting, and prescribed angles of inclination as long as at least one portion does not.  This is not supported by the intrinsic evidence.

The term "having" is closed in the context of the claims because it is involved in describing a crucial element of the invention.  *Rolls-Royce, PLC v. United Techs. Corp.*, 2011 WL 1949662, at *3-4 (E.D. Va. May 20, 2011) (construing "having" to be closed because the "crucial element of the claim cannot be open-ended.").  As discussed throughout this memorandum, the smooth rotation of microfacets and lack of a prescribed angle of inclination are critical aspects of the disclosed invention.  (*See* V.C and V.D above.)  They are aspects of the entire profile of each trench; not just a small portion.  Lexington's open construction of "having" would impermissibly broaden the claims to cover trench structures not reasonably contemplated by the specification.

For these reasons, Feit Electric's construction of "having" should be adopted.

F.      **"First Layer . . . Comprising a Plurality of Inclined Lower Portions"**

| Term(s) | Feit Electric's Construction(s) | Lexington's Construction(s) |
|---|---|---|
| "first layer . . . comprising a plurality of inclined lower portions" | "first layer. . . comprising two or more portions that grow from adjacent slopes of the trench so as to meet and combine in the trench region" | No construction necessary, otherwise "first layer having lower portions that contain inclines" |

As a preliminary manner, this claim phrase should be construed.  The parties have very different understandings of what this phrase means.  *See O2 Micro*, 521 F.3d at 1361.  Not construing this claim phrase would require the jury to improperly make determinations of claim meaning.

Feit Electric's construction aligns with the specification's discussion of "inclined lower portions."  Figures 1A-C shows the process by which inclined lower portions are grown.  For example, the specification explains that "FIG. 1A is a cross-sectional view showing initial layer deposition over the textured substrate surface in accordance with the embodiment of the present invention.  The layer deposition proceeds in a manner such that the **inclined layers** 12 emerging **from the adjacent slopes meet and combine in the trench region**."  (Ex. 1, 4:46-51.)



(*Id*., Fig. 1A (annotated).)  The specification goes on to explain that "[a]s the growth proceeds, the inclined growth diminishes and the upper section 14 of the structure becomes planar as

shown in FIG. 1B.  Thus the inclined layers are confined and embedded in the early stage of the deposition."  (*Id*., 4:52-55.)



Fig. 1B

(*Id*., Fig. 1B (annotated).)  Finally, the specification explains "[s]ince the dislocation propagates along with the advance of the growth front, it is also inclined away from propagating upwards. The dislocation defects are guided towards the center of the trench where the counter approaching dislocations confront each other and combine as illustrated in FIG. 1C."  (*Id*., 4:56-61.)



Fig. 1C

(*Id*., Fig. 1C (annotated).)  Consistent with the discussion of Figures 1A-C, the specification consistently describes the inclined lower portions of the layer as being those portions that grow from opposing, inclined slopes of the trench so as to meet and combine in the center of the trench.  (*See id.*, Abstract ("The initial inclined layer deposition serves to guide the extended

defects to designated gettering centers in the trench region where the defects combine with each other."); 2:15-18 ("The controlled layer deposition over the textured surface district proceeds such that the inclined layer growth in the trench region diminishes in the early stage of the process."); 5:7-11 ("By incorporating the present textured surface district, the inclined layer growth is further optimized such that the extended defects are deliberately routed to designated gettering centers in the trench region.").)

Lexington's construction is unclear and not supported by the intrinsic evidence. Lexington construes "inclined lower portions" as "lower portions that contain inclines."  This distorts the claim language and disregards the very purpose of the critical inclined layer growth. Based on the specification, the lower portions of the layer **are** inclined; these lower portions do not themselves **contain** inclines.  In any case, Lexington's construction is ambiguous and unhelpful.

Feit Electric's construction is consistent with the intrinsic evidence and should be adopted.

### G.    "Layer"

| Term | Feit Electric's Construction | Lexington's Construction |
|---|---|---|
| "layer" | "defined thickness of material" | "a thickness of material, which may be made up of sub-layers, but does not refer to a substrate" |

There are two disputes here: (1) whether a "layer" is a "**defined** thickness of material" and (2) whether a substrate is a type of "layer."

The term "layer" is used in many different contexts within the '851 patent.  The specification discusses a "buffer layer," "lower cladding ," "active layer," "upper cladding layer," and "contact layer."  (*See id.*, 7:21-25.)  Each of these is "defined" by its function.  A

layer may also be "defined" by its composition, such as a GaAs (gallium arsenide) layer.  (*Id*.,

1:22-23.)  Consistent with a layer being a "defined thickness," technical dictionaries have

defined a "layer" as "[a] **defined thickness** which is part of a material . . . . For example, . . . **a**

**layer in a semiconductor** . . . ."  (*See* Ex. 7 (Wiley Electrical and Electronics Engineering

Dictionary, 2004 ed.) at "layer.")  A substrate can be also be a "layer."  It is a defined thickness

of material in a light-emitting device such as an LED.  Consistent with this, technical dictionaries

have defined "substrate" as "[t]he base **layer**, or other surface upon which something is

deposited, etched, attached, or otherwise prepared or fabricated."  (*Id*. at "subsrate.")

By omitting "defined," Lexington's construction allows one to arbitrarily take any

thickness of a light-emitting device and call it a "layer."  This arbitrary layer could include

portions of the real layers—the active layer, buffer layer, etc.  This is not how "layer" is used in

the patent or in the relevant field.

## VI.   CONCLUSION

For the foregoing reasons, Feit Electric respectfully requests the Court to adopt its

proposed constructions of the disputed claim terms.

Dated:  March 25, 2013                           Respectfully submitted,


                                                 /s/ Gwyn Williams

                                                 Gwyn Williams MA#565181
                                                 LATHAM & WATKINS LLP
                                                 John Hancock Tower, 20th Floor
                                                 200 Clarendon Street
                                                 Boston, MA 02116
                                                 Telephone:  (617) 880-4512
                                                 Fax: (617) 948-6001
                                                 gwyn.williams@lw.com

                                                 Admitted *Pro Hac Vice*

                                                 Lawrence J. Gotts VA# 25337
                                                 LATHAM &WATKINS LLP
                                                 555 Eleventh Street, NW
                                                 Suite 1000
                                                 Washington, DC 20004-1304
                                                 Telephone: (202) 637-2200
                                                 Fax: (202) 637-2201
                                                 larry.gotts@lw.com

                                                 Ryan R. Owens CA# 269370
                                                 LATHAM &WATKINS LLP
                                                 650 Town Center Drive
                                                 20th Floor
                                                 Costa Mesa, CA 92626-1925
                                                 Telephone: (714) 540-1235
                                                 Fax: (714) 755-8290
                                                 ryan.owens@lw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of March, 2013, I electronically transmitted the

foregoing DEFENDANT FEIT ELECTRIC'S OPENING CLAIM CONSTRUCTION

MEMORANDUM to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to those registered as ECF registrants, and also sent the foregoing

document to each of the following individuals via electronic mail:

> Via Email
> David S. Godkin
> Anne Marie Longobucco
> BIRNBAUM & GODKIN LLP
> 280 Summer Street
> Boston, MA 02210
> 617-307-6100
> godkin@birnbaumgodkin.com
> longobucco@birnbaumgodkin.com
>
> Via Email
> Robert D. Katz
> KATZ PLLC
> 6060 N. Central Expressway, Suite 570
> Dallas, TX 75206
> 214-865-8000
> rkatz@katzlawpllc.com

/s/ Gwyn Williams